# United States Court of Appeals
## For the First Circuit

No. 00-1549

CLAIRE A. STRAUGHN,

Plaintiff, Appellant,

v.

DELTA AIR LINES, INC.,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

---

Before

Selya, Circuit Judge,

Cyr, Senior Circuit Judge,

and Boudin, Circuit Judge.

---

Anna Barbara Hartz, with whom Gottesman & Hollis, P.A., Heather Burns, and Upton, Sanders & Smith were on brief for appellant.
Diane Murphy Quinlan, with whom Mark T. Broth, Devine, Millimet & Branch, P.A., and Jay D. Milone were on brief for appellee Delta Air Lines, Inc.

---

May 17, 2001

---

**CYR, <u>Senior Circuit Judge</u>.** Plaintiff Claire A. Straughn urges us to vacate several summary judgment rulings which ultimately prompted the district court to dismiss her claims against Delta Airlines, Inc., alleging gender discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2001, <u>et</u> <u>seq.</u>, race discrimination under 42 U.S.C. § 1981, and breach of contract, wrongful termination, and defamation under New Hampshire law. Lastly, she seeks to set aside the summary judgment entered against her on Delta's counterclaim for reimbursement of certain workers' compensation benefits inadvertently disbursed to her in the first instance. We affirm the district court judgment in all respects.

**I**

**<u>BACKGROUND</u>**

Straughn began her employment with Delta in October 1983, as a reservations agent. In January 1995, she became a sales representative in its Boston Marketing Office, responsible for an area which includes Vermont and Western New Hampshire. She was one of five women, as well as the only African American, among the fourteen sales representatives in the Boston Marketing Office. Her immediate supervisor was Zone Manager Helen Meinhold, who reported directly to Lou Giglio, District Marketing Manager.

On January 19, 1996, while on a sales call for Delta, Straughn fell and broke her wrist, which disabled her from work for

most of the ensuing period through March of 1997. Although she returned to work during this period, on each occasion she was unable to continue for more than a few days.

Under the applicable Delta employment policy, employees injured on the job were entitled to thirteen weeks' accident leave, as well as accumulated sick leave, vacation time and full salary. Nevertheless, these employees were obligated to reimburse Delta for all workers' compensation benefits received while absent on accident leave, pursuant to the following Delta policy statement:

> Personnel who receive weekly benefits for occupational injury or illness under the provisions of applicable Worker's (sic) Compensation laws must reimburse the Company in an amount equal to the sum of all such weekly benefits received for the period during which the Company pays the employee's wages, in whole or in part, under accident leave, sick leave, and disability benefit policies.

ESIS, the third-party administrator of Delta's self-insured workers' compensation plan, makes an independent determination as to whether an employee is eligible for workers' compensation benefits, based on the controlling workers' compensation laws and the circumstances surrounding the work-related injury. ESIS disburses workers' compensation benefits directly to the eligible Delta employee, notwithstanding the fact that the employee continues

4

to receive full salary from Delta pursuant to its accident leave policy. While the pertinent policy statement, supra, obligates an employee absent on accident leave to reimburse Delta for all workers' compensation benefits received from ESIS while on full salary, once an employee's accident leave, accumulated sick leave and vacation time have been exhausted the employee is removed from the Delta payroll and thereafter retains whatever workers' compensation benefits are received from ESIS.

Thus, Straughn received three forms of remuneration while on accident leave. First, during the fourteen-month period she was unable to work, she received her regular Delta salary. Second, from January 25 through July 4, 1996, she received $11,608.86 in workers' compensation benefits through ESIS. Third, she received periodic checks from ESIS as reimbursement for medical expenses directly related to her injury, including medical bills, prescription costs, and travel expenses to and from medical appointments.[1] Notwithstanding her obligation to remit the $11,608.86 in workers' compensation

---

[1]Although the parties have not addressed the matter, these reimbursements appear to have been made in accordance with Mass. Gen. Laws ch. 152, §§ 30 & 45, which require insurers to furnish injured employees with "adequate and reasonable health care services, and medicines if needed, together with the expenses necessarily incidental to such services . . . ," see id. § 30, as well as reimbursement for "reasonable travel expense incidental" to physician examinations requested by the insurer or the insured, see id. § 45.

benefits received from ESIS during her absence from work, Straughn failed to do so.

Meanwhile, Delta inadvertently continued to disburse Straughn's full salary from July 5, 1996, until her eventual return to work in March, 1997, even though her entitlement to full salary had expired on July 4, 1996, pursuant to the accident leave policy. Furthermore, the administrative employees responsible for disbursing Straughn's salary were neither aware that she had received and retained workers' compensation benefits, along with her regular Delta salary, from January 25 through July 4, 1996, nor that her Delta salary continued to be disbursed some nine months beyond the time she was entitled to receive it.[2] In March of 1997, upon discovering its error, Delta conducted a thorough review of all amounts disbursed to Straughn since her injury.

Shortly after returning to work in April of 1997, Straughn was asked by Giglio, on two separate occasions, whether she had received workers' compensation benefits in addition to

---

[2]The confusion appears to be explainable, at least in part, by the fact that during the time Straughn received workers' compensation benefits through ESIS, she coordinated her receipt of the benefits solely with Catherine Ackles, an employee of ESIS, and did not deal directly with any Delta employee. Nonetheless, Delta acknowledges, as its error, the breakdown in its communications with ESIS. Thus, Delta has not sought to impose responsibility upon Straughn for the receipt of these overpayments in the first instance.

her salary while absent on accident leave.[3]  On each occasion, Straughn denied receiving workers' compensation benefits, explaining instead that she had received money which she used for meals and other expenses relating to her injury.[4]

At her deposition, however, Straughn recalled these conversations with Giglio as follows:

> A.   [Giglio] said to me . . . "By the way, <u>did you receive any money from compensation</u>?"
>
> Q.   And what did you answer?
>
> A.   <u>I told him, no</u>.   The money that compensation gave me I used to order out my meals, to help take care of myself, because I was not able to do anything.  I had no support system . . . .
>
> Q.   <u>Could you have said</u> . . . "No, they gave me money for food, transportation and expenses directly related to my accident"?

---

[3]Upon returning to work, Straughn was asked by Giglio to sign and backdate certain personnel forms relating to her injury.  Apparently, these forms were to have been completed at the time of her injury, rather than when she returned to work. Straughn refused to do so.

[4]Although neither party clearly defines the contours of ESIS's obligation to reimburse Delta employees for certain injury-related expenses, each has assumed that though travel expenses and certain medical costs are reimbursable by ESIS, food and other personal costs are not.  Their assumptions appear to be based on the obligations imposed by Massachusetts law. <u>See</u> Mass. Gen. Laws ch. 152, §§ 30, 45.  There is no record evidence that any Delta or ESIS policy required that Delta employees be reimbursed for food and similar personal costs in these circumstances.

A.    I could have said something like that.

(Emphasis added).

After Straughn repeatedly denied having received workers' compensation benefits — an assertion flatly contradicted by the business records maintained by both Delta and ESIS — Giglio relayed her responses to Michelle McColly, Senior Analyst in the Delta Personnel Department.[5] McColly instructed Giglio to approach Straughn again and obtain her written response.  At the same time, Giglio was instructed to suspend Straughn pending further investigation.

---

[5]Straughn contends on appeal that her responses to these inquiries were mixed and ambiguous, rather than direct denials. Thus, she argues, Giglio should have sought clarification from her first, rather than simply reporting to his superiors that she had denied receiving workers' compensation benefits.  The district court succinctly attended to that contention as follows:

> Straughn's seemingly odd (and ostensibly ambiguous) 'no, but yes' response to Giglio's inquiry about her receipt of workers' compensation benefits makes perfect sense in context and is, in fact, unambiguous.  She denied receiving workers' compensation benefits from ESIS (which she was obligated to sign over to Delta), but acknowledged that ESIS had honored her periodic requests for reimbursement of medical, travel, and related expenses. That response simply did not jibe with the records maintained by Delta and its agent, ESIS.

District Court Opinion, at 11.

8

Following the conversation with McColly, Giglio inquired of Straughn in the presence of two Delta supervisors — Helen Meinhold and Tom Keating — regarding whether she had received workers' compensation benefits while on accident leave. Straughn responded that she had not, stating once again that she had simply received checks to compensate her for costs related to medical treatment, transportation, and meals.

Giglio thereupon suspended Straughn, as instructed, and requested that she reduce her statement to writing. Prior to providing Giglio with her written response, however, Straughn consulted with an attorney who had been representing her in a related tort action against the owner of the premises at which her injury occurred.

Helen Meinhold later recounted Straughn's responses to Giglio's inquiry as follows:

> A.   [Giglio] asked [Straughn] whether she had received any additional monies in addition to her paycheck.
>
> Q.   And what was her response?
>
> A.   No; that she only had gotten reimbursement of some medical expenses.

Subsequently, Straughn recalled the interrogation by Giglio:

> I was called into Lou [Giglio's] office and asked if I had received money from

9

compensation to which I initially responded no, but went on to explain to him as I had in the past that I had received _money_ _from_ _compensation_ to help with my expenses such as food, medicine, transportation, etc.

(Emphasis added).

The written response Straughn thereafter submitted to Giglio explained as follows:

_When_ _I_ _spoke_ _to_ _my_ _attorney_ _she_ _advised_ me [that] until she had an opportunity to look into this[,] _do_ _not_ _advise_ _of_ _comp_ _money_. When I spoke to [Catherine Ackles] again she reiterated [the] above info. Also was advised by attorney & [Catherine Ackles] all will be settled. _When_ _Lou_ _[Giglio]_ _asked_ _me_ _if_ _I_ _received_ _comp,_ _all_ _I_ _thought_ _of_ _was_ _attorney_ _advise_ [_sic_].

(Emphasis added). Thus, the written response provided by Straughn admits that she intentionally misled Delta — _albeit_ _ostensibly_ _on_ _the_ _advice_ _of_ _counsel_ — regarding her receipt of workers' compensation benefits while continuing to receive full salary from Delta.

Consequently, on May 8, 1997, Giglio recommended that Straughn be terminated from her employment due to dishonesty. Following further review, McColly recommended that Straughn be required to remit the $11,608.86 in workers' compensation benefits wrongfully retained, and either resign or face discharge.

Thereafter, acting on these recommendations, Director

10

of Equal Opportunity Richard Ealey terminated Straughn's employment due to her dishonesty in responding to the repeated inquiries regarding her receipt of workers' compensation benefits. Director Ealey, himself an African American, explained that it was Straughn's dishonesty which distinguished her conduct from that of other employees who had not spontaneously reimbursed Delta after receiving workers' compensation benefits in similar circumstances.

Straughn commenced an internal grievance procedure with the Delta administrative appeals board. In due course, the board, comprised of McColly and another member, recommended to Director Ealey that Straughn be reinstated. The appeals board neither assigned reasons for its recommendation nor prescribed conditions for the reinstatement, except that Straughn reimburse Delta for all workers' compensation benefits wrongfully retained.

At that point Giglio offered Straughn employment as a Sales Staff Assistant, a new position with no direct sales responsibilities, at an annual salary of $39,696 rather than the $46,462 salary she formerly received. After Straughn accepted the offer, Delta placed a "final warning" letter in her personnel file: the most severe disciplinary action short of

11

outright termination.[6]

Following her reinstatement, Straughn brought suit in the United States District Court for the District of New Hampshire. Delta answered and counterclaimed for the $11,608.86 in workers' compensation benefits retained by Straughn, then moved for summary judgment on all claims, as well as its counterclaim, contending that Straughn had been discharged for a legitimate, nondiscriminatory reason: _i.e._, her persistent lack of candor in responding to legitimate inquiries regarding her wrongful retention of workers' compensation benefits.

After determining that Straughn had presented no competent evidence that Delta had tendered a pretextual reason for terminating her employment, the district court granted summary judgment against Straughn on the gender and race

---

[6]The "final warning" letter stated, in relevant part:

> Even if you did not intend to keep these overpayments, your failure to monitor these payments and to fully advise Delta of these overpayments causes us great concern with respect to your ability to be a reliable and effective Sales Representative. As you know, that position entails great autonomy and responsibility, including the handling of company resources, and we do not believe you should hold such a position at this time considering the way you handled these overpayments. Consequently, we have decided to reinstate your employment as a Sales Staff Assistant.

discrimination claims, as well as all state-law claims.  At the same time, the district court directed summary judgment for Delta on its counterclaim.

**II**

**DISCUSSION**

**A.**   **The Title VII and Section 1981 Claims.**

   **1.**   **The Standard of Review and Burden Shifting Framework.**

   Summary judgment rulings are reviewed <u>de novo</u>, <u>see</u> <u>Mulero-Rodriguez</u> v. <u>Ponte, Inc.</u>, 98 F.3d 670, 672 (1st Cir. 1996), after considering the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party."  <u>Feliciano De La Cruz</u> v. <u>El Conquistador Resort & Country Club</u>, 218 F.3d 1, 5 (1st Cir. 2000).  The summary judgment ruling is to be upheld provided "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Moreover, "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue, this standard <u>compels</u> summary judgment if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation."  <u>Feliciano</u>, 218 F.3d at 5 (quoting

13

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)) (internal quotation marks omitted) (emphasis added).

Where, as here, no direct evidence of discrimination was proffered by the plaintiff, we apply the McDonnell Douglas - Burdine - Hicks burden-shifting analysis to the Title VII and Section 1981 claims. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999). Under that familiar regimen the plaintiff "must carry the initial burden . . . of establishing a prima facie case of . . . discrimination." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

In employment discrimination cases, the plaintiff must make a prima facie

> . . . showing that: (1) [she] is a member of a protected class; (2) [her] employer took an adverse employment action against [her]; (3) [she] was qualified for the employment [s]he held; and (4) [her] position remained open or was filled by a person whose qualifications were similar to [hers].

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); McDonnell Douglas, 411 U.S. at 802; Conward, 171 F.3d at 19)).

We shall assume, without deciding, that Straughn proffered sufficient competent evidence to establish prima facie claims based on race and gender discrimination. At that point

14

it became necessary for Delta to articulate "a legitimate, non-discriminatory reason for its adverse employment action[,]" id. (citing McDonnell Douglas, 411 U.S. at 802; Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 12 (1st Cir. 1998)), by identifying enough admissible evidence to "support a [rational] finding that unlawful discrimination was not the cause of the employment action." Feliciano, 218 F.3d at 5-6 (quoting Hicks, 509 U.S. at 507) (internal quotation marks omitted).

Delta proffered competent evidence that Straughn was dismissed due to her dishonesty in repeatedly attempting to mislead a supervisor regarding her wrongful retention of workers' compensation benefits in violation of Delta policy. Richard Ealey, the Delta official ultimately responsible for the dismissal action, attested that though there had been other instances in which Delta employees had not spontaneously surrendered workers' compensation checks in similar circumstances, he was "not aware of any situation where the individual denied [having received such checks] when questioned."

Where, as here, the employer proffers "a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason . . . was 'a coverup' for a 'discriminatory decision.'" Id. at 6 (quoting McDonnell

15

Douglas, 411 U.S. at 805). At that point, Straughn's "burden of producing evidence to rebut the stated reason for [Delta's] employment action merge[d] with the ultimate burden of persuading the court that she [was] the victim of intentional discrimination." Id. (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981)) (internal quotation marks omitted). Straughn failed to generate a genuine issue of material fact regarding whether she was discharged due to either her race or gender.

2. **Pretext and Discriminatory Animus.**

At the ultimate stage in the burden-shifting analysis, it would have been necessary that Straughn persuade the factfinder that she experienced unlawful discrimination at the hands of her employer, see Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999), cert. denied, --- U.S. ----, 120 S. Ct. 1174 (2000) (citations omitted), by "present[ing] sufficient evidence to show both that the employer's articulated reason for [the discharge was] a pretext and that the true reason [was] discriminatory[,]" id. (emphasis added) (internal quotation marks and citations omitted). E.g., Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 581 (1st Cir. 1999) ("[T]he plaintiff must show both that the employer's 'proffered reason is a sham, and that discriminatory animus sparked [its]

16

actions.'") (quoting Conward, 171 F.3d at 19).  The "same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder reasonably to infer that unlawful discrimination was a determinative factor in the adverse employment action."  Feliciano, 218 F.3d at 6.

Thus, we must determine whether the competent evidence proffered by Straughn, together with all reasonable inferences which may be drawn in her favor, raised "a genuine issue of fact as to whether [her] termination, [and/or the demotion following her rehire, were] motivated by [either race or gender] discrimination."  Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) (citations and quotations omitted).  The summary judgment must be set aside if the record includes sufficient competent evidence from which a reasonable jury "could (although it need not) infer that the employer's claimed reasons for terminating [the] employment were pretextual and that the decision was the result of discriminatory animus."  Dominguez-Cruz v. Shuttle Caribe, Inc., 202 F.3d 424, 431 (1st Cir. 2000).  Finally, we must "exercise particular caution before [sustaining] summary judgment[s] for employers on such issues as pretext, motive, and intent."  Santiago-Ramos, 217 F.3d at 54 (citing Hodgens v. General Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998)).

17

Straughn insists that the rationale Delta ascribes for discharging her — the alleged efforts to conceal her wrongful retention of workers' compensation benefits — was pretextual and its actual intent was discriminatory. The record does not bear out her contention.

It is undisputed that Director of Equal Opportunity Richard Ealey, after reviewing the dismissal recommendations by Michelle McColly and Giglio, ultimately was responsible for terminating Straughn's employment. Yet there is no record evidence, nor has Straughn contended, that either Ealey or McColly harbored any race-or-gender-based animus. Instead, Straughn maintains that Giglio, her intermediate supervisor, was in a position to influence Ealey, the ultimate decisionmaker; thus, she argues, Giglio indirectly brought about her wrongful termination for discriminatory reasons by presenting the ultimate decisionmaker with a <u>pretextual</u> justification.

Straughn contends in particular that Giglio intentionally inquired in an ambiguous manner regarding her receipt of workers' compensation benefits, then mischaracterized her responses, as categorical rather than qualified, when reporting to Ealey and McColly. She claims that Giglio's discriminatory intentions are evidenced (i) by workplace utterances reflecting bias against African Americans and (ii) by

18

relatively undesirable work assignments, unfair criticisms, and the withholding of various perquisites and incentives available to other Delta sales representatives.

Straughn also claims that the decision to rehire her, following her internal appeal, demonstrates that Delta management ultimately realized that Giglio's rendition of her responses had been contrived, whereas her actual responses were accurate. Similarly, she insists that Giglio unilaterally demoted her to a position entailing reduced responsibilities and salary even though Delta had recommended her unconditional reinstatement. Finally, Straughn argues that the discipline initially imposed upon her — outright discharge — differed materially from that meted out to another Delta employee who had made similar statements to Giglio in the past. We discuss these contentions in turn.

a. **The Allegedly Discriminatory Utterances
and Related Workplace Mistreatment**

In order to sustain her burden of persuasion on pretext, Straughn needed to demonstrate either that her dismissal was (i) "more likely motivated" by discrimination than by the explanation proffered by Delta, or (ii) the proffered "explanation [was] unworthy of credence" in circumstances where the suspect denial, taken together with other facts, suggests

19

such a motivation. Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804-05); see also Fite v. Digital Equipment Corp., 232 F.3d 3, 6-7 (1st Cir. 2000). The burden of persuasion on pretext may be met, inter alia, by showing "that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker." Santiago-Ramos, 217 F.3d at 55 (discriminatory comments by direct supervisor, along with similar comments by key decisionmaker, constitute evidence of pretext where direct supervisor was consulted by key supervisor during decisionmaking process) (emphasis added).

### (i) The "Southern Black" Accent

Straughn testified on deposition that Giglio frequently used an offensive "southern black" accent at meetings attended by her and other Delta employees. Although Giglio denies the charge, it must be credited at summary judgment. See id. (citing DeNovellis v. Shalala, 124 F.3d 298, 308 (1st Cir. 1997)).

For present purposes, we assume arguendo that there are circumstances in which use of an offensive "southern black" workplace accent, by a superior in a position to influence the key decisionmaker, would constitute probative evidence that the proffered explanation for disciplining an employee was

20

pretextual. Cf. id. (Discriminatory comments, by key decisionmaker and another person in position to influence decisionmaker, "could lead a jury to conclude that [the employer's] proffered reasons for firing [plaintiff] were actually a pretext for discrimination."). As we have acknowledged, "in combination with other evidence[,]" see McMillan v. Massachusetts Soc'y for Prev. of Cruelty to Animals, 140 F.3d 288, 300 (1st Cir. 1998), cert. denied, 525 U.S. 1104 (1999), so-called "stray remarks" may permit a jury reasonably to determine that an employer was motivated by a discriminatory intent, id. But though such "stray remarks" may be material to the pretext inquiry, "their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or . . . were not related to the employment decision in question, or were made by nondecisionmakers." Id. at 301 (emphasis added) (citations omitted). See, e.g., Santiago-Ramos, 217 F.3d at 55 (remarks within two weeks of discharge probative of pretext); Fernandes, 199 F.3d at 583 (remarks at time of employment action probative of pretext); cf. McMillan, 140 F.3d at 301 (remoteness heightened where at least one of three remarks occurred several years before challenged employment action).

Although statements directly related to the challenged

21

employment action may be highly probative in the pretext inquiry, see Santiago-Ramos, 217 F.3d at 55; Fernandes, 199 F.3d at 583, mere generalized "stray remarks," arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance. Compare McMillan, 140 F.3d at 301 (workplace remarks by male department head at time remote from incident in dispute — regarding physical traits and sexual activities of female co-workers, but bearing no direct relationship to employment — held not probative of pretext where challenged decision involved lower salaries for female employees), with Fernandes, 199 F.3d at 583 (comments by decisionmaker — including "I don't need minorities"; "I don't need residents on this job"; "I don't have to hire you locals or Cape Verdean people" — were not mere "stray remarks" where challenged employment action concerned refusal to rehire dark-skinned residents of Cape Verdean descent). Accordingly, even if we were to assume that the assertedly offensive workplace "accent" is somehow suggestive of racial bias,[7] it would not be significantly probative of pretext absent some discernible indication that its communicative content, if any, materially

_____

[7]As concerns the gender-based discrimination claim, however, we can discern no relevance whatsoever in the "southern black" accent evidence.

22

erodes the stated rationale for the challenged employment action.

Straughn proffered no evidence that Giglio ever used the nondescript "southern black" accent either during or in relation to the challenged employment action. Nor is there competent evidence from which a rational factfinder might fairly infer that the communicative import of the nondescript accent pertained to employment matters, let alone to Straughn or her employment. Indeed, Straughn herself has never intimated either a rationale or a circumstantial predicate for reasonably inferring that the "southern black" accent amounted to anything other than insensitive banter. Thus, Straughn's naked ipse dixit was insufficient to generate a genuine issue of material fact.

Accordingly, we conclude that the "southern black" accent allegedly used on occasion by Giglio, without more, is not probative of pretext on the part of Delta, given (i) the absence of any discernible contextual or temporal relationship between the discharge decision and the workplace accent used by Giglio, (ii) the demonstrably self-sufficient basis for the management recommendation by Richard Ealey to discharge Straughn due to her persistent work-related dishonesty, and (iii) the distinctly subordinate role Giglio played in the dismissal

23

decision.

### (ii)      The Disparate Workplace Treatment

Straughn claims that Giglio singled her out for inferior work assignments, unfairly criticized her performance, and withheld various perquisites and inducements accorded similarly situated sales representatives. The district court determined that the evidence Straughn tendered to demonstrate pretext was insufficient in light of the countervailing evidence that Delta management reasonably believed that Straughn repeatedly lied to her superiors regarding her receipt and wrongful retention of workers' compensation benefits while absent on accident leave and receiving full salary. See District Court Opinion, at 24.[8] After evaluating Straughn's differential treatment claim against the "totality of the evidence . . . 'as part of an aggregate package of proof[,]'" Fernandes, 199 F.3d at 581 (citation omitted), we conclude that the district court ruling is founded on adequate record support.

----

[8]The district court noted:

> Straughn's complaint[s] that Giglio chastised her for being late and for driving excessive miles, and that she was denied reimbursement for donuts she says she purchased for a customer, arguably support her discrimination claim to some degree, though the persuasive value of such evidence in [sic] not substantial.

District Court Opinion, at 24. We agree.

24

Although pretext may be established with evidence of "differential treatment in the workplace[,]" id. (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992)) (internal quotation marks omitted), Straughn failed to sustain her evidentiary burden in relation to the claim that she was singled out for inferior work assignments. The record discloses that the Vermont and Western New Hampshire sales territory, to which Straughn initially was assigned, historically has generated lower revenues than all but one other sales territory within the Boston Marketing Office area and accordingly has been selected in the past as a training territory for relatively inexperienced sales representatives.

Nor did Straughn tender evidence that there was any normal time frame within which sales representatives in training customarily were transferred to more lucrative sales territories. Similarly, she proffered no evidence regarding any criteria utilized by Delta in determining when newer sales representatives were considered eligible for transfer to more desirable sales territories.

On the other hand, the record plainly discloses that a white male sales representative drew the Maine sales territory, which is comparable to the Vermont-Western New Hampshire sales territory in terms of the driving distances and

25

relatively low sales revenues. Yet Straughn proffered no evidence regarding the tenure of her counterpart in the Maine sales territory. Finally, there is no record evidence that Straughn's experience or tenure differed in any material respect from that of her predecessors in the Vermont-Western New Hampshire sales territory.

Since Straughn tendered no competent evidence that her initial assignment as a sales representative differed materially from that of other relatively new sales representatives in the Boston Marketing Office, summary judgment was appropriate. See id.; Conward, 171 F.3d at 20 ("Where . . . the plaintiff in a disparate treatment race [or gender] discrimination case offers comparative evidence . . . to raise an inference of racial [or gender-based] discrimination, [she] must provide a suitable provenance for the evidence by showing that others similarly situated . . . in all relevant respects were treated differently by the employer.") (emphasis added).

**(iii) Miscellaneous Evidence of Pretext**

Similarly, Straughn tendered insufficient other evidence to generate a trialworthy issue on pretext. Instead, she simply pointed to evidence that Giglio reprimanded her for tardiness, driving excessive miles, visiting too few sales accounts, and failing to generate adequate "shuttle" flight

26

ticket sales. She maintains that these criticisms were unjustified, given the undisputed evidence that (i) sales representatives in the Boston Marketing Office were not required to report to work at any particular hour; (ii) her sales territory necessitated more driving, as it is one of the two largest in geographic area; and (iii) it normally generates fewer "shuttle" ticket sales.

Straughn relies almost exclusively upon the Thomas case, which held that where poor work performance is the stated reason for discharging an employee, pretext may be established by demonstrating that the evaluation process itself was tainted by racial bias and that the plaintiff's "abilities and qualifications were equal or superior to employees who were retained." Thomas, 183 F.3d at 65 (quoting Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1119 (1st Cir. 1993)) (internal quotation marks omitted). The Thomas case is inapposite.

There is no record evidence that Straughn's discharge was related in any way to work performance. For that matter, there is no evidence that Straughn ever received a "poor" work evaluation. See id. at 62-63. On the contrary, following the only documented review of her work performance with the Boston Marketing Office, Straughn received a "high" rating from none

27

other than Giglio and Meinhold. Consequently, the present contention provides no support for the claim that Straughn was subjected to "differential treatment in the workplace." Fernandes, 199 F.3d at 581.

Straughn also testified that various privileges available to other sales representatives were withheld from her, including authorization to: (a) provide clients with free promotional flight tickets, (b) obtain reimbursement for meals while entertaining clients, and (c) work on a part-time basis from a "virtual" home office. Nevertheless, she failed to proffer competent evidence that she and these other sales representatives were "similarly situated" in all or even most relevant respects. See Conward, 171 F.3d at 20.

**(a) Free Promotional Flight Tickets**

Straughn asserts, in conclusory fashion, that all sales representatives in her office were permitted, at their discretion, to give promotional flight tickets to their respective clients, whereas she "rarely" was allowed to do so. She makes no attempt to approximate the number of occasions on which promotional flight tickets were made available to her or to other Delta sales representatives. Instead, she focuses on a single instance in which Helen Meinhold directed her to recover a promotional flight ticket which Straughn had made

28

available to the <u>spouse</u> of a client. It is undisputed that Delta policy contemplates that these promotional flight tickets are to be made available to Delta clients, not their spouses. The record also indicates that the episode referred to by Straughn occurred during the first six months of her tenure as a sales representative. Yet Straughn presented no competent evidence that she and these other sales representatives were similarly situated, either in regard to tenure, experience, or the numbers of clients served.

### (b) **Client Entertainment**

Straughn asserts that <u>some</u> sales representatives were reimbursed for meal costs incurred while entertaining Delta clients. The one person she names — Jane Martin — began work with the Boston Marketing Office two weeks before Straughn. Other than similar starting dates, however, Straughn tendered no evidence that she and Martin were "similarly situated," most notably in regard to the particular characteristics of their respective sales territories and clienteles. Moreover, Straughn admitted that she was <u>never</u> <u>denied</u> <u>reimbursement</u>. Instead, she states that she was <u>reprimanded</u> by Meinhold on one occasion for purchasing donuts for the personnel in a "couple of offices" and warned not to do so again. <u>See</u> <u>also</u> note 8 <u>supra</u>.

### (c) **The "Virtual Home Office" Privilege**

Straughn testified that all other sales representatives in the Boston Marketing Office were granted the "virtual home office" privilege. See Mesnick, 950 F.2d at 824 (noting that evidence of "differential treatment in the workplace" supports pretext claim). Yet Straughn points to no evidence that she and these other sales representatives were similarly situated.

Competent proof that the plaintiff was denied privileges and opportunities available to similarly situated employees may constitute probative evidence that an adverse employment action was motivated by discriminatory animus. See Thomas, 183 F.3d at 63 (evidence that supervisors prevented minority employee from making important presentation and withheld "appropriate developmental opportunities" and computer training, all of which were accorded non-minority employees, supports disparate treatment claim). Straughn testified on deposition that she made at least three requests to work from a virtual home office. The record also reflects that some sales representatives were permitted to work from a "virtual" home office. Yet Richard Ealey denied Straughn permission to do so following her extended absence from work, since her doctor had advised that, though able to work, Straughn was not yet well enough to drive an automobile — hence unable to service clients, the primary responsibility of her position.

30

As concerns Straughn's previous requests to work from a "virtual" home office, one was denied by Meinhold and several by Giglio. The record reflects that her first request to Giglio was made within six months of her hiring. Straughn presented no evidence that other new sales representatives were accorded the privilege so early in their tenure. With regard to the other requests which Giglio denied, she points to no evidence (i) that she was "similarly situated" to any sales representative who was accorded the privilege, or (ii) that she met Delta's criteria for evaluating such requests. Instead, she simply asserts in conclusory fashion that everyone else was permitted to work part-time from a "virtual" home office. Thus, she failed to present competent evidence that the proffered reason for the challenged employment action was pretextual. See Fernandes, 199 F.2d at 581; Conward, 171 F.3d at 20; Mesnick, 950 F.2d at 824.

Moreover, given the overwhelming weight of the evidence that the proffered reason for the dismissal action was both sound and sufficient, the tenuous disparate treatment evidence presented by Straughn was plainly insufficient to enable a reasonable factfinder to conclude that Giglio had fabricated the report about Straughn's prevarications relating to her wrongful retention of the workers' compensation benefits.[9] Nothing more

_____

[9]The other instances Straughn cites in relation to her disparate treatment claim lack adequate evidentiary support as

31

is exigible.

**b.** **The Alleged Distortions of Straughn's Responses**

Straughn likewise failed to generate a trialworthy issue in relation to her claim that Giglio mischaracterized her responses to his inquiries regarding her receipt and retention of workers' compensation benefits. As the district court appropriately noted, Straughn's deposition testimony, affidavit, and written statement abundantly demonstrate her utter lack of candor in responding to these legitimate inquiries.

Upon initial inquiry by Giglio, as to whether she had received "any money from compensation," Straughn responded in the negative, then added that she had received money "to order out my meals [and] to help take care of myself . . . ." On the second occasion, in the presence of two other supervisors, Straughn again denied receiving workers' compensation benefits,

---

well. With regard to the authority to provide clients with promotional flight tickets, she points to no evidence that Giglio was involved in any way. Instead, Straughn herself testified on deposition that it was Meinhold who restricted her authority in this regard.

Straughn acknowledged that some, but not all, Delta sales representatives were reimbursed for client meal costs. Furthermore, she neither presented evidence that she was not reimbursed, nor that she was similarly situated to those employees who were regularly reimbursed. Thus, she failed to generate a rational inference that any race-or-gender based bias harbored by Giglio accounted in any way for the alleged rejections of her requests for reimbursement. See Conward, 171 F.3d at 20.

while allowing that she had received reimbursements for certain expenses. These responses were not only materially false, but knowingly made, in that Straughn was well aware that she had received and retained workers' compensation benefits meant to compensate her for lost <u>salary</u>, while continuing to receive <u>full salary</u> from Delta.

Straughn also received other checks from ESIS, representing reimbursements for various expenses incurred in connection with her job-related injury, such as medical services, prescription drugs, and travel expenses incurred in connection with medical appointments. Although food was not an expense reimbursed by ESIS, it was among those Straughn <u>listed</u> when Giglio asked whether she had received money for "expenses." Curiously, Straughn now attempts to characterize her response to Giglio as an admission that she <u>had</u> <u>indeed</u> <u>received</u> <u>both</u> <u>workers'</u> <u>compensation</u> <u>benefits</u> <u>and</u> <u>reimbursements</u> <u>for</u> <u>expenses</u> <u>from</u> <u>ESIS</u>. She reasons that since she listed food — an expense not eligible for reimbursement from ESIS — her direct response to Giglio that she had <u>never</u> <u>received</u> workers' compensation benefits somehow acknowledged that she <u>had</u> <u>indeed</u> <u>received</u> workers' compensation benefits.

She also attempts to rationalize her negative response to Giglio as simply a reference "to the promised workers'

33

compensation settlement, not weekly benefits . . . ." Since she has not elaborated, we are left to speculate about the precise details.

Thus, essentially Straughn sought — indeed still seeks — to rationalize the obvious inaccuracies in her response to Giglio, which she attributes to inartful language, <u>as including</u> <u>an accurate response to a question she was never asked</u>. In contrast, Giglio and Delta management rationally assessed her persistent refusals to acknowledge her receipt and wrongful retention of workers' compensation benefits as attempts to conceal the truth.

Undeterred, Straughn continues to defend her responses as technically accurate in the sense that she did tell Giglio that she had received food money, which could only have derived from workers' compensation benefits since food is not an expense related to medical treatment. This artful contention is belied as well, however, by her own written submission following her suspension by Delta:

> When I spoke to my attorney[,] she advised
> me . . . <u>do not advise of comp money</u>. . . .
> When [Giglio] asked me if I received comp,
> <u>all I thought of was attorney advise [sic]</u>.

(Emphasis added).

Thus, Straughn <u>admitted to an attempt to conceal</u> the fact that she had received workers' compensation benefits while

34

on accident leave from her employment with Delta, albeit on the advice of counsel.  At a minimum, then, the summary judgment record unambiguously established that Straughn plainly understood that she had received workers' compensation benefits while on full salary, yet set out to conceal that fact from Delta.

No less importantly, at this point in the burden-shifting analysis the principal focus must be upon whether McColly and Ealey, the responsible Delta decisionmakers, reasonably believed that Straughn lied, rather than whether she actually lied.  "In assessing pretext, [our] 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible."  Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1118 (1st Cir. 1993) (quoting Mesnick, 950 F.2d at 824; Gray v. New England Tel. & Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)).  As Straughn has never claimed that either McColly or Ealey harbored a gender-based or race-based bias, but rather that they were misled by Giglio's allegedly wrongful recommendation that her employment be terminated, in these particular circumstances it is the reasonableness of Giglio's belief alone which is controlling.

The record plainly demonstrates that Giglio reasonably regarded Straughn's responses to his inquiries as wrongful

35

attempts to conceal what he well knew to be so, based on Delta's business records; <u>viz.</u>, that Straughn had received and wrongfully retained workers' compensation benefits from ESIS, while continuing to receive her full Delta salary on accident leave. Giglio accordingly recommended that Straughn be discharged, due to her persistent dishonesty, pursuant to longstanding Delta policy.

In these circumstances, no rational trier of fact could conclude that Giglio did not reasonably believe that Straughn had responded dishonestly when repeatedly confronted with the documented fact that she had received workers' compensation benefits, as well as full salary, while on accident leave. Thus, Straughn utterly failed to generate a trialworthy issue of material fact as to whether Giglio <u>reasonably</u> <u>believed</u> that she had attempted to mislead him regarding her receipt and retention of the workers' compensation benefits to which she was not entitled.[10] A <u>fortiori</u>, she failed to generate a trialworthy

---

[10]Nevertheless, Straughn now insists that Giglio "set [her] up and then reported her," by asking whether she had received workers' compensation benefits, rather than simply telling her that he knew she had, then presenting her with various repayment options. We can discern no animus in these attempts to verify, firsthand with Straughn, the documented information that Giglio had received. As the district court appropriately noted, in these circumstances Straughn cannot —

> legitimately complain that Giglio knew the
> answer to the question about her receipt of
> workers' compensation benefits before he

issue as to whether McColly and Ealey reasonably accepted Giglio's version of the relevant events.

### c.  The Rehiring Decision As Evidence of Pretext

Pretext may be established "'by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' such that a factfinder could 'infer that the employer did not act for the asserted non-discriminatory reasons.'"  Santiago-Ramos, 217 F.3d at 56 (quoting Hodgens, 144 F.3d at 168).  For present purposes, we shall assume, without deciding, that there may be circumstances in which the decision to rehire a discharged employee constitutes competent evidence of pretext, at least insofar as the rehiring plainly undermined the proffered justification for the original discharge.  Cf. Nitschke v. McDonnell Douglas Corp., 68 F.3d 249, 252 (8th Cir. 1995) (evidence of employee's competence, as demonstrated by employer's decision to rehire, would have constituted evidence of pretext had incompetence been the proffered ground for original discharge).  Even so, the summary judgment record came up well short of the required evidentiary support for Straughn's

asked it.  Put simply, an employer has a legitimate right to expect that its employees will respond in a truthful, non-evasive manner to its questions . . . .

District Court Opinion, at 26, n. 6.

37

contention that the decision to rehire her in a different capacity reflected an abandonment of Delta's original position that she had misled Giglio in the first instance.

Straughn insists that the decision to rehire her, after her internal appeal, indicates that upon considering her version of the encounter with Giglio, Delta management must have realized that Giglio had misled McColly and Ealey regarding Straughn's responses to Giglio's inquiries. McColly, one of the two Delta supervisors who participated in the internal appeal, explained the rationale for recommending Straughn's reinstatement as follows:

> [D]espite the fact that I . . . believed that [Straughn] had still done something wrong, and furthermore that she knew she had done something wrong, I did believe, after meeting with her, that there was a considerable amount of confusion in the administration of the workers' compensation, or that it could have been handled better. And Ms. Straughn did have a good record, and several years with the company, so we decided that we should recommend . . . another chance.

(Emphasis added).

Asked to clarify what she meant by "confusion," McColly stated that she had neither concluded that Straughn was confused by Giglio's questions, nor that Straughn had retained the workers' compensation payments unwittingly. Instead, McColly explained: "I still believe that Ms. Straughn very likely knew

38

that she had not been entitled to the payments," emphasizing that the appeals process had in no sense caused her to "question the story that Lou Giglio had been telling . . . [and] that ultimately led to [Straughn's] termination."

Plainly, then, the recommendation to rehire Straughn was made notwithstanding McColly's earnest belief that it was very likely that Straughn knowingly had done "something wrong." Furthermore, McColly stated that though the workers' compensation disbursements should have been managed more efficiently and that some actual confusion had indeed resulted, Delta nonetheless had been justified in discharging Straughn due to her repeated attempts to mislead.

Thus, there is no evidentiary support for the contention that the appeals board hearing prompted McColly to conclude either that Giglio had misrepresented Straughn's responses or that Straughn had been wrongfully discharged. Instead, the record is clear that McColly recommended a "second chance" based on Straughn's overall employment record, notwithstanding ample grounds for the dismissal. Accordingly, not only does the decision to rehire Straughn provide no support for the claim that the proffered reason for discharging her was "unworthy of credence," Burdine, 450 U.S. at 256, it strongly evidences an absence of any forbidden animus on the part of

39

Delta.

Next, we turn to the contention that Straughn's demotion to a position entailing reduced compensation and responsibilities, notwithstanding the unconditional reinstatement recommended by Delta management, demonstrates that Giglio harbored discriminatory motives in recommending her discharge in the first instance. The record reflects that McColly transmitted a memorandum to Director of Equal Opportunity Richard Ealey summarizing a discussion which had taken place during the appeals process, as follows: "Mr. Stevenson and I recommend [Straughn's] request for reinstatement be granted and that she be required to reimburse Delta for the overpayment."

Subsequently, McColly explained that her recommendation to Ealey was simply that Straughn be reinstated, whereas the particulars relating to her reinstatement, i.e., position and salary, were left to others. Furthermore, Giglio denied any role in determining that Straughn should be demoted after her rehiring and Straughn neither identified nor presented any evidence to the contrary. Thus, Straughn's rehiring and placement in a position entailing reduced salary and responsibilities provide no support for the claim that the stated reason for her discharge was pretextual.

40

###### d.    **The Other Disparate Treatment Evidence**

Straughn next contends that the discipline Delta administered to her was disproportionately severe in comparison with that meted out to one John Higgins, a white-male sales representative who had worked under Giglio in the Boston Marketing Office and supposedly engaged in comparable conduct. The record reflects that Higgins was disciplined for falsifying weekly sales reports relating to time spent with clients.  Yet, it also plainly establishes that Higgins readily acknowledged the misrepresentations upon inquiry by Giglio.  Consequently, Delta simply relegated Higgins to a less desirable sales territory and placed a "letter of concern" in his personnel file.

Evidence that an employer administered disparate treatment to similarly situated employees may be competent proof that the explanation given for the challenged employment action was pretextual, see Conward, 171 F.3d at 19, provided the plaintiff-employee can make a preliminary showing "that others similarly situated . . . in all relevant respects were treated [more advantageously] by the employer."  Id. at 20 (citing Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)) (emphasis added) ("Reasonableness is the touchstone: while the plaintiff's case and the comparison cases that [s]he

41

advances need not be perfect replicas, they must closely resemble one another in respect to relevant facts and circumstances.").

The district court correctly concluded that Straughn and Higgins were <u>not</u> similarly situated in certain relevant respects. For one thing, their wrongful conduct differed materially. Although each misled a supervisor, Straughn stood to realize a substantial monetary benefit through her deception — more than $11,000 — whereas Higgins did not. Yet more importantly, unlike Straughn, <u>Higgins forthrightly acknowledged his misconduct when first confronted</u>, whereas Straughn repeatedly attempted to deceive Giglio in an effort to conceal the fact that she had retained workers' compensation benefits to which she was not entitled. These "differentiating or mitigating circumstances" unquestionably undermined Straughn's attempt to demonstrate that her conduct was similar to Higgins's in all material respects. <u>See</u> <u>id.</u> at 21. Consequently, her disparate treatment claim was fatally flawed.

As Straughn failed to generate a genuine issue of material fact regarding either pretext or disparate treatment, summary judgment was entirely proper on her gender and race discrimination claims.

## B. **The State Law Claims**

42

1.  **Wrongful Discharge**

Straughn contends that the district court erred in ruling that no trialworthy issue of material fact remained regarding her wrongful discharge claim under New Hampshire law. Straughn alleged that Delta wrongfully (i) discharged her for refusing to backdate certain personnel forms at Giglio's request upon her return to work in April 1997, (ii) then demoted her for resorting to the internal appeals process.

In order to prevail on a wrongful termination claim under New Hampshire law, "a plaintiff must establish two elements: one, that the employer terminated the employment out of bad faith, malice, or retaliation; and two, that . . . the employment [was terminated] because the employee performed acts which public policy would encourage or . . . refused to perform acts which public policy would condemn." Short v. School Admin. Unit No. 16, 136 N.H. 76, 84, 612 A.2d 364, 369 (1992) (citing Cloutier v. A & P Tea Co., Inc., 121 N.H. 915, 921-22, 436 A.2d 1140, 1143-44 (1981)). Bad faith or malice on the part of an employer may be established under New Hampshire law where (i) an employee is discharged for pursuing policies condoned by the employer, (ii) the record does not support the stated reason for the discharge, or (iii) disparate treatment was administered to a similarly situated employee. See Cloutier, 121 N.H. at

43

921-22, 436 A.2d at 1143-44.

Upon returning to work after her injury, Straughn was asked by Giglio to complete and backdate certain disability forms to correspond with the date of her injury, more than a year earlier.  See supra note 3.  Straughn declined.  Shortly thereafter her employment was terminated by McColly, on Giglio's recommendation.

As the summary judgment record plainly demonstrates, see supra Section II.A, Delta discharged Straughn based on its well-founded belief that she had not responded honestly regarding her receipt and retention of workers' compensation benefits to which she was not entitled.  In these circumstances, the mere temporal proximity between (i) the occasion on which Straughn refused to backdate the disability forms and (ii) the later recommendation by Giglio that her employment be terminated pales to insignificance against the overwhelming weight of the evidence underpinning the plainly legitimate rationale for the discharge decision by Delta.  Accordingly, we need not address the public policy issue Straughn endeavors to raise.

Furthermore, there is simply no validity to the claim that Straughn was demoted by Delta for resorting to its internal appeals process.  Following her discharge on June 16, 1997, and the ensuing internal appeal, Straughn was rehired by Delta in a

44

position which carried reduced compensation and entailed less responsibility. Once again Straughn attempts to elide the obvious, however, by disregarding the indisputable reality that Delta thereby <u>voluntarily</u> conferred a substantial benefit upon her, <u>notwithstanding</u> <u>her</u> <u>wrongful</u> <u>conduct</u>. Thus, no rational factfinder reasonably could conclude that Straughn was wrongfully demoted for resorting to the internal appeals process.

### 2. <u>Breach of Contract</u>

Straughn faults the dismissal of her breach of contract claim as well, which was based on the spurious thesis that she was dismissed as a result of Delta's failure to monitor her receipt of workers' compensation benefits as provided in the Delta Corporate Safety Handbook:

> The supervisor should establish a protocol for communication with the injured employee, the medical provider and the workers' compensation administrator. . . . This communication will ensure that Delta management is apprised of the injured employee's diagnosis, status, and prognosis for return to work.

Straughn claims that the district court incorrectly determined that (i) she could not establish a breach of contract, since she was not an intended beneficiary of the Delta policy statement, and (ii) no damages resulted from the alleged breach in any event.

45

Although the district court did question whether Straughn was an intended beneficiary of the above-quoted policy, its decision did not rest on that basis. Instead, the district court _assumed_ _arguendo_ that the Delta policy statement creates an enforceable legal obligation that Delta monitor the workers' compensation benefits received by its employees.[11] As the district court decision in no sense rested on the basis suggested by Straughn, her present argument fails.

The alternative argument is flawed as well. Assuming, as did the district court, that Delta was obligated, yet failed, to monitor her receipt of workers' compensation benefits, Straughn cannot demonstrate that any harm flowing from the failure to monitor was proximately related to her discharge. "Damages are available only if the harm was a reasonably foreseeable result at the time the parties entered into the contract." Independent Mech. Contractors, Inc., v. Gordon T. Burke & Sons, Inc., 138 N.H. 110, 114, 635 A.2d 487, 489 (1993)

---

[11]The New Hampshire Supreme Court has held that "an employer's unilateral promulgation to present at-will employees of a statement of intent to pay and provide such economic benefits may be recognized under New Hampshire law as an offer to modify their existing relationship by means of a unilateral contract, which offer is subject to such an employee's acceptance by continued performance of his duties." Panto v. Moore Bus. Forms, Inc., 130 N.H. 730, 731, 547 A.2d 260, 261-62 (1988) (Souter, J.). Thus, statements in employee handbooks regarding benefits may give rise to enforceable contracts under New Hampshire law. See id. at 734-35.

46

("[A] plaintiff may satisfy this requirement by specifically proving that the defendant 'had reason to know the facts' at the time the parties contracted and to foresee that the injury would be a probable consequence of a breach."). Any breach of the obligation to monitor Straughn's receipt of workers' compensation benefits resulted in an overpayment of benefits, rather than termination of her employment.

As previously discussed at considerable length, see supra Section II.A., the termination of Straughn's employment directly resulted from her attempts to conceal — through dishonest responses to the inquiries initiated by Delta — her retention of the inadvertently disbursed workers' compensation benefits. Consequently, summary judgment was entirely proper, since the decision to terminate Straughn's employment was in no sense precipitated by any failure on the part of Delta to monitor her receipt of workers' compensation benefits, as distinguished from her wrongful retention of those benefits and her prevarications concerning their retention.

### 3. Defamation

The remaining state-law claim alleged that Straughn was defamed by Giglio following her reinstatement. Straughn testified on deposition that two coworkers told her that Giglio said she had done something "very, very bad." This claim

47

likewise fails, since there can be no actionable defamation unless the offending statement was false. See Nash v. Keene Publ'g Corp., 127 N.H. 214, 219, 498 A.2d 348, 351 (1985) (citing Duchesnaye v. Munro Enter., Inc., 125 N.H. 244, 252, 480 A.2d 123, 127 (1984)). "To establish defamation, there must be evidence that a defendant failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Independent Mech. Contractors, Inc., 138 N.H. at 118, 635 A.2d at 492 (emphasis added) (citations omitted). As previously discussed, see supra Section II.A, the record plainly demonstrates that Straughn attempted to mislead her supervisors in an effort to conceal the fact that she had retained more than $11,000 in workers' compensation benefits to which she was not entitled. Accordingly, summary judgment was entirely proper.

## C.    The Delta Counterclaim

The district court granted summary judgment on the Delta counterclaim for $11,608.86, representing the total workers' compensation benefits improperly retained by Straughn. Straughn insists that summary judgment was inappropriate since Delta failed to establish the amount due.

Delta established its entitlement to $11,608.86, as claimed, representing the workers' compensation benefits

48

mistakenly disbursed to Straughn between January 25 and July 4, 1996, while she remained on full salary with Delta. Donna Crews, Delta Payroll Administrator, attested that she had calculated the mistaken overpayments to Straughn at <u>not less than</u> $11,608.86.[12] Straughn cites no record evidence to the contrary and Delta is entitled to reimbursement in that amount pursuant to its "accident leave" policy.

Accordingly, the summary judgment entered on Delta's counterclaim was entirely proper.

## III

### CONCLUSION

The district court judgment is affirmed in all respects. Costs are assessed against appellant.

**SO ORDERED.**

---

[12]Once her accident and sick leave benefits had been exhausted, Straughn received full salary from July 1996 through March 1997, when she returned to full-time work. These salary payments totaled approximately $20,000 in <u>additional overpayments</u> to Straughn. Nevertheless, at oral argument, counsel explained that though Delta was entitled to reimbursement in the larger amount, it intended to pursue only its $11,608.86 counterclaim for the period January 25 through July 4, 1996, since its own oversight had enabled Straughn to continue to receive full salary after July 4, 1996.