**Carmen Cuadros ZEGARRA, Plaintiff,**

v.

**D'NIETO UNIFORMS, INC., P.R.; Uniformes Empresariales Sa De CV, Mexico, Defendants.**

**Civil No. 08–1324 (FAB).**

United States District Court, D. Puerto Rico.

June 10, 2009.

Maria H. Sandoval, Maria H. Sandoval Law Office, San Juan, PR, for Plaintiff.

Carlos R. Paula, Labor Counsels, San Juan, PR, Melissa Figueroa–Del Valle, Labor Counsels, Hato Rey, PR, for Defendants.

## OPINION & ORDER

FRANCISCO A. BESOSA, District Judge.

On March 14, 2008, plaintiff Carmen Cuadros Zegarra ("Cuadros") filed a complaint against defendants D'Nieto Uniforms, Inc., PR ("D'Nieto") and Uniformes Empresariales SA de CV, Mexico ("Uniformes") (Docket No. 1). In her complaint, Cuadros alleges discrimination on the basis of national origin in violation of Title VII of the 1964 Civil Rights Act and attaches various claims pursuant to state laws regarding discrimination, overtime payment, and tort damages.[1] Pending before the Court are two motions. On May 5, 2009, defendants together filed a motion for summary judgment. (Docket No. 54) Defendants have also moved the Court to strike the plaintiff's opposition (Docket No. 79) to summary judgment for failure to comply with Court deadlines and Local

---

1. The parties submitted memoranda regarding, among other issues, the existence of true diversity in this case. (Docket Nos. 62 and 66) Because the plaintiff admits she is a permanent resident of Puerto Rico (Docket No. 66, ¶ 4) and because one of the defendant corporations incorporated and has its principal place of business in Puerto Rico, true diversity in this case does not exist. 28 U.S.C. § 1332(a)(4)("[A]n alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled"). The Court thus analyzes the claim only as it arises under its federal question jurisdiction pursuant to Title VII of the 1964 Civil Rights Act.

Rule of Civil Procedure 10 and Local Rule of Civil Procedure 56. (Docket No. 81) As an initial matter, and for the sake of clarity in the opinion to follow, the Court will first dispose of defendants' motion to strike plaintiff's opposition.

■ Defendants argue, and the Court agrees, that plaintiff's opposition to the summary judgment motion was untimely and failed to comply with local rules. Trial judges have well-established discretion to set deadlines as part of their responsibility to manage crowded dockets efficiently. "[A] district judge must often be firm in managing crowded dockets and demanding adherence to announced deadlines. If he or she sets a reasonable due date, parties should not be allowed casually to flout it or painlessly to escape the foreseeable consequences of noncompliance." *Mendez v. Banco Popular de P.R.*, 900 F.2d 4, 7 (1st Cir.1990). To that end, a district judge may issue orders "as soon as practicable" fixing deadlines for the filing of dispositive motions. Fed.R.Civ.P. 16(b); *Torres v. Puerto Rico*, 485 F.3d 5, 10 (1st Cir.2007). "We have made it clear that district courts may punish such dereliction in a variety of ways, including but not limited to the preclusion of untimely motions . . ." *Rosario–Diaz v. Gonzalez*, 140 F.3d 312, 315 (1st Cir.1998).

Plaintiff was given numerous extensions and a pointed warning from the Court and still did not comply with filing deadlines. Defendants filed their motion for summary judgment on May 5, 2009. On May 21, 2009, the plaintiff requested an extension of time to oppose the summary judgment motion (Docket No. 65) which this Court granted on May 22, 2009 (Docket No. 67),

ordering the plaintiff to file her opposition on or before May 27, 2009. The plaintiff failed to file her opposition in compliance with the Court's deadline, prompting the defendants to request on May 28, 2009 that their motion for summary judgment be deemed unopposed. (Docket No. 75) The plaintiff then immediately requested a short extension to file her opposition. (Docket No. 76) The Court granted another extension (Docket No. 77), ordering the plaintiff to file her opposition within two days, by May 29, 2009, yet specifically warning the plaintiff in the text of the order itself, "Counsel should be aware that in this circuit other responsibilities do not excuse ignoring a court order" and citing a case from the First Circuit Court of Appeals which holds that "the fact that an attorney has other fish to fry is not an acceptable reason for disregarding a court order." *Chamorro v. Puerto Rican Cars, Inc.*, 304 F.3d 1, 5 (1st Cir.2002) Plaintiff again failed to file her opposition according to the Court's deadline, instead filing her opposition on May 31, two days after the deadline had passed. (Docket No. 79) Defendants now move to strike the plaintiff's opposition to the summary judgment motion due to plaintiff's noncompliance with Court deadlines. "If the courts do not take seriously their own scheduling orders, who will?" *Carnrite v. Granada Hosp. Group, Inc.*, 175 F.R.D. 439, 447 (W.D.N.Y.1997).

The Court views plaintiff's persistent disregard for clearly set deadlines, by itself, as necessitating a consequence, which in this case appropriately equals the striking of the late-filed papers.[2]

---

2. The Court also agrees with the defendants that the plaintiff's opposition failed to comply with Local Rules of Civil Procedure 10(b) and 56(c) governing, respectively, translation of documents and opposing statements of facts.

Because the Court finds the opposition itself to be untimely, however, the opposition is stricken from the record, and these additional procedural defects are moot.

The plaintiff's opposition to the motion to summary judgment is hereby **STRICKEN** from the record, and the Court deems the defendants' motion for summary judgment unopposed. Furthermore, for the reasons provided below, the Court **GRANTS** the defendants' motion for summary judgment.

## I. Factual Background

### A. Plaintiff's Relationship with D'Nieto and Uniformes SA de DV, Mexico

Plaintiff Cuadros is a Peruvian national who is domiciled in and a permanent resident of Puerto Rico. (*Plaintiff's Complaint,* Docket No. 1, ¶ 4) Cuadros is currently employed with defendant D'Nieto, where she has worked since the end of 2004.[3] From the time Cuadros began working for D'Nieto until November 13, 2007, she was supervised by D'Nieto's Manager, Wanda de Leon ("De Leon").[4] When De Leon hired Cuadros in 2004 for her position as an Administrative Assistant, De Leon was aware that Cuadros was Peruvian. Prior to the beginning of 2007, Cuadros and De Leon enjoyed an amiable relationship. They spent time together out of work, including Thanksgiving holidays in De Leon's home and a beach trip together. De Leon hired Cuadros's daughters for D'Nieto work projects in both 2006, 2007 and 2008.

On December 14, 2006 Cuadros emailed De Leon about using her vacation time to visit her sick mother in Peru. The email referenced a prior conversation between Cuadros and De Leon regarding the situation, and Cuadros also informed De Leon in the email that she "will be traveling on Monday 18, for which I beg you to allow me to take the vacation days I have accumulated." Cuadros provided De Leon with contact information in the event she was needed for consultation. While Cuadros was on vacation, De Leon called her on several occasions. Despite being asked to cut her vacation short, Cuadros took all of her accumulated vacation days plus four days without pay for a total of nineteen work days, from December 18, 2006 to January 16, 2007.

After her return from Peru, Cuadros received an interoffice memorandum from De Leon on January 26, 2007 reprimanding her for taking vacation without sufficient notice, listing a number of problems with Cuadros's work performance, and requesting improvement in those problem areas. Cuadros spoke with Uniformes representative Michael Meyer[5] ("Meyer")

---

**3.** Plaintiff's employment at D'Nieto was briefly interrupted in 2005 due to her voluntary resignation and subsequent rehiring. This fact is irrelevant, however, to the determinations made here.

**4.** Wanda de Leon was terminated for reasons not related to this case on November 13, 2007.

**5.** The parties dispute Michael Meyer's position and authority as it relates to the Uniformes company. Defendants contend that Meyer is a consultant to Uniformes while plaintiff contends that he is a Uniformes employee holding a high-ranking position. Because the controversy over Meyer's relationship with Uniformes is not relevant to the issues raised in the motion for summary judgment, the Court does not address that controversy here, and instead presents Meyer's position in the light that plaintiff viewed him during the times relevant to the complaint. Plaintiff's testimony during deposition makes clear that she communicated with Meyer about her relationship with De Leon under the assumption that he was the appropriate authority at Uniformes with whom to register complaints about her employment. The record also indicates that Meyer operated throughout his communications with plaintiff as though he had authority to intervene in, and assist in, resolving the conflicts that arose between the plaintiff and her supervisor.

about her vacation in which she expressed her belief that she was entitled to the vacation she had taken and accepting responsibility for any consequences resulting from her vacation. Meyer expressed dissatisfaction that Cuadros took an extended vacation time during a period of the year when her work was crucial to D'Nieto's performance, yet told her during a phone call that there was no problem and that "we have to move forward and keep working." Cuadros admitted in her deposition that before leaving for her vacation in December, 2006, De Leon told her to write herself some extra hours, which Cuadros then did.

Also on January 26, 2007, Cuadros's position at D'Nieto was reclassified from Administrative Assistant to Sales Assistant,[6] a position classified as "exempt." Meyer testified that the company was experiencing financial difficulties that prompted De Leon's implementation of what has been described vaguely in the record as "controls." These "controls" seemed to consist of disciplinary warnings and actions issued against the D'Nieto staff, including the changing of various staff responsibilities to scale back on expenditures. In an interoffice memorandum announcing Cuadros's reclassification, Meyer and De Leon informed Cuadros that "we have made some changes in the tasks for the company's improved operations," then outlined the tasks expected of Cuadros following the reclassification. There is no indication in the record of how (or if) the tasks required of Cuadros changed as a result of the reclassification, or whether the reclassification changed other aspects of Cuadros's work, such as compensation for use of Cuadros's personal car for work purposes. The letter informing plaintiff of her reclas-

sification indicated, however, that her payment would be the same.

Meyer testified in his deposition that he began receiving complaints from both Cuadros and De Leon about their contentious relationship starting in February, 2007, a relationship Meyer believes worsened in March and April of that year. Meyer described a generally acrimonious, unmanageable conflict developing between Cuadros and De Leon that they were unable to resolve on their own. As a result of the rising acrimony and in an effort to preserve neutrality, Meyer says he brought in Uniformes employee Estela Calzada as a non-interested party and that they, together, initiated an investigation into the conflict, holding discussions with all the involved parties.

The defendants contend that Cuadros's attitude began to deteriorate following her discomfort surrounding her vacation leave and the declassification that occurred in the midst of the company's economic crisis and subsequent "control" measures. Cuadros described De Leon's attitude toward her as changing at some point in 2007, but was unable to determine the cause of that changed attitude.

De Leon told Meyer that Cuadros's family and personal problems were affecting Cuadros's work performance and attitude, to the extent that communication with Cuadros was impossible. De Leon also told Meyer that Cuadros was constantly initiating conflict, looking for a way to start it, and that she believed Cuadros had retained an attorney and was attempting to manufacture a discrimination suit using such instances as medical appointments and sick leave to "set up" the company. De Leon believed that Cuadros was con-

---

**6.** Supporting documents deem the first position both as "administrative assistant" and as "manager's assistant."

stantly insubordinate, questioning all of De Leon's job-related instructions. De Leon also testified that numerous complaints had been filed about Cuadros's work performance. Both women accused the other of invading her computer, and Meyer changed the security codes on Cuadros's computer to protect it from unwanted invasion.

For her part, Cuadros sent Meyer emails complaining that De Leon's treatment of her was not tolerable, citing De Leon's negative attitude toward her. During her deposition, Cuadros contended that De Leon gave her a hard time about taking medical leave, giving her tasks during times she had already informed De Leon she would be needing to attend medical appointments, deliberately interfering with those medical appointments. Cuadros admitted in her deposition, however, that she was permitted to take a sick leave of approximately 30 days when needed. Cuadros also testified that she and De Leon had conflicts because De Leon would ask her to stay after regular working hours and to come to work on some Saturdays. In an email to Meyer at Uniformes, Cuadros acknowledged the financial difficulties suffered by the company, raised concerns about her changed status from non-exempt (hourly payments) to exempt (salaried payment), and complained about having to work hours longer than the regular workday.

The record is unclear whether, following Cuadros's complaints, Cuadros may have received overtime payments despite being classified as an exempt employee. De Leon testified that she tried to explain to Cuadros on several occasions that exempt employees do not receive overtime payments but do have a more flexible work schedule, including the ability to come in later or leave earlier when needed, as well as work later or more when needed. Meyer testified that he was not sure whether Cuadros may have been accommodated by D'Nieto following her complaints, despite her exempt status, by paying her for overtime.

Plaintiff contends that she was subject to a hostile work environment and adverse employment actions based on discrimination. D'Nieto did not offer a medical plan prior to the summer of 2007 to any of its employees, yet Cuadros had negotiated with D'Nieto payment for the costs of her COBRA continuation coverage from her former employer. She was therefore the only D'Nieto employee whose health coverage was paid for by D'Nieto. (Cuadros admitted that even De Leon was not provided health coverage prior to July 2007.) By the end of July, 2007, D'Nieto had obtained a group medical plan for its employees. Cuadros's COBRA coverage, however, ended on May 30, 2007, and Cuadros testified in her deposition that she believed she was denied the medical insurance to which she was entitled during the gap between the expiration of her COBRA coverage and D'Nieto's procurement of a group plan for all employees.

Cuadros also contends that she was subjected to degrading and humiliating comments from her supervisor, De Leon. According to Cuadros's testimony, De Leon had a habit of telling Cuadros whenever payroll payments came up in conversation that Cuadros should feel "very well paid." Defendants point out that De Leon gave Cuadros an advance of a payroll check one time when asked.

Cuadros stated in her deposition that when De Leon disliked the manner Cuadros performed her work, De Leon would tell Cuadros that the manner of work might be what Cuadros does "in [her] country"—"but not here." Cuadros further stated that De Leon would ask Cuadros why she was in Puerto Rico and why

she did not stay in her country. Cuadros alleges that De Leon said to her that since Cuadros was not from Puerto Rico, Cuadros did not know the local laws.

Cuadros also stated in her deposition that there was no other fact or incident upon which she based her allegation that she was subjected to humiliating or degrading comments. Cuadros explained that she came to the conclusion that she was discriminated against "based on all the events that took place," and that De Leon's comments about being well paid were motivated by Cuadros's Peruvian nationality.

At some point in 2007, Cuadros said that De Leon asked Cuadros not to come into her office. Although Cuadros believes De Leon may have forbid her to enter the office because Cuadros made a report with the State Insurance Fund (regarding D'Nieto), Cuadros admitted that she does not know why De Leon forbade her to enter the office, which lasted for four to five weeks. Cuadros contends that De Leon also did not greet her at the office, and that on one occasion De Leon refused to give her a ride back to the office after an appointment with a client. She also recalled an incident in which De Leon told her to shut up in front of a tailor, yet stated she did not know why De Leon told her to shut up. Due to the contentiousness of their interactions, De Leon asked that all of Cuadros's messages to her be left in writing.

Despite this contentious relationship, De Leon hired Cuadros's daughter for various odd jobs, helped one of Cuadros's daughters get a three-month gym membership in support of her modeling, lent Cuadros and her daughters various material items (articles of clothing, jewelry), and bought Cuadros gifts from time to time.

Although it is unclear what became of the investigation into the complaints of De Leon and Cuadros about each other, Meyer testified that it was his impression that the conflict between Cuadros and De Leon was the consequence of a soured personal relationship-a complicated issue between two friends who fell out with each other. On March 14, 2008, Cuadros filed the instant action alleging discrimination.

## II. Legal Standards and Analysis

### A. Summary Judgment Standard

The Court's discretion to grant summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. The Rule states, in pertinent part, that the court may grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52. (1st Cir.2000). The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once a properly supported motion has been presented, the opposing party has the burden of demonstrating that a trial-worthy issue exists that would warrant the court's denial of the motion for summary judgment. For issues where the opposing party bears the ultimate burden of proof, that party cannot merely rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir.2000).

In order for a factual controversy to prevent summary judgment, the con-

tested facts must be "material" and the dispute must be "genuine." Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Id.* at 252, 106 S.Ct. 2505. It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion." *Maldonado–Denis v. Castillo–Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994).

██ In making this assessment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). The court may safely ignore, however, "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990).

### B. Exhaustion of Administrative Remedies

██ As a prerequisite to adjudication by this Court, Title VII requires aggrieved individuals to file a charge with the EEOC "within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). In a "deferral jurisdiction" such as Puerto Rico, this period is extended.[7] *See* 42 U.S.C. § 2000e–5(e)(1); *Mohasco Corp. v. Silver*, 447 U.S. 807, 814 n. 16, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980); *Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181–82 (1st Cir.1989).

 Hostile work environment claims are treated differently under the requirements for exhaustion. The Supreme Court has explained that a hostile work environment is created by "repeated conduct"—"a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)(quoting 42 U.S.C. § 2000e–5(e)(1)). Hostile work environment claims are not based on discrete, isolated acts, "but on an aggregation of hostile acts extending over a period of time." *Havercombe v. Dep't of Educ.*, 250 F.3d 1, 6 (1st Cir.2001). Therefore, the statute of limitations is satisfied by a hostile work environment claim filed within 300 days of any of the multiple acts that, taken together, created the hostile work environment. *See Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 18 (1st Cir.2002).

In this case, Cuadros references in the most cursory of manners her compliance with the administrative remedies exhaustion requirement, claiming in her complaint merely that "the administration process has been completed." (Docket No. 1, ¶ 9.) This lack of detail makes it difficult to determine whether administrative remedies were in fact properly exhausted. The defendants do not contest exhaustion process, however, so the Court's analysis assumes that proper exhaustion was completed.

---

**7.** In fact the timeliness of a complaint filed in a deferral state may operate in a complicated fashion involving a waiting period between the filing of charges with different authorities, but these factors need not be addressed here. *See Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 48 n. 5 (1st Cir.1999).

### C. Title VII

Title VII of the Civil Rights Act of 1964 prohibits discrimination against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color or national origin." 42 U.S.C. § 2000e–2(a)(1). Plaintiff's original complaint makes her claims under Title VII difficult to decipher. Though she lists only one cause of action specifically pursuant to Title VII,[8] for the sake of completeness and clarity, the Court addresses both the tangible employment and the constructive employment action claims[9] recognizable in the plaintiff's complaint: (1) Plaintiff's claims that at various times she lost benefits to which she was entitled; and (2) Plaintiff's claim that she was subjected to a hostile working environment.

### i. Anti–Discrimination: Tangible Employment Action Claims

█ In a Title VII case, discrimination may be shown through direct evidence or through the cumulative effect of indirect evidence of the employer's motivation. *See Lipsett v. Univ. of P.R.*, 864 F.2d 881, 909 (1st Cir.1988) (*c.f., Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101–02, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)). Where a plaintiff produces direct evidence of discrimination, he or she may prevail without proving all of the elements of a *prima facie* case under the *McDonnell Douglas* framework. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

█ In the absence of direct evidence of discrimination[10] the court may apply the *McDonnell Douglas* framework.[11] To prove a *prima facie* case of discrimination under this framework, the plaintiff must establish by a preponderance of the evidence (1) that the plaintiff is within a protected class; (2) that the plaintiff is qualified for job; (3) that the employer took an adverse action against the plaintiff; and (4) that after plaintiff's rejection, the position was filled, or the employer continued its efforts to fill the position, with someone of plaintiff's qualifications. *Mariani–Colon v. Department of Homeland*

---

**8.** The plaintiff's complaint lists four specific causes of action: hostile work environment under Title VII and three other actions arising out of Puerto Rico laws.

**9.** Title VII requires that the harassment or injury "must amount to either a tangible or a constructive employment action." *Lee–Crespo*, 354 F.3d at 37 (1st Cir.2003). A tangible action, such as a firing or failure to promote, is a significant change in employment status while a constructive action, such as a hostile work environment or ongoing harassment is comprised of multiple separate acts constituting together an unlawful employment practice. *Id.* at 44–5 (internal citations omitted.)

**10.** The Court finds, and no party argues otherwise, that no direct evidence of discrimination exists to support the plaintiff's claims. "[E]vidence is direct ... when it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 60 (1st Cir.2000); *see Ayala–Gerena v. Bristol Myers–Squibb Co.*, 95 F.3d 86, 96 (1st Cir.1996) (noting that "direct evidence does not include stray remarks in the workplace"); *see, e.g., Pages–Cahue v. Iberia Líneas Aéreas de España*, 82 F.3d 533, 536–37 (1st Cir. 1996).

**11.** Where there is evidence of both discriminatory and non-discriminatory animus, and the plaintiff requests it, the court may evaluate the evidence through the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *see Moron–Barradas v. Dep't of Educ. P.R.*, 488 F.3d 472, 480 (1st Cir.2007) (*citing Hillstrom v. Best Western TLC Hotel*, 354 F.3d 27, 31 (1st Cir.2003)). The plaintiff in this case did not request the mixed-motive analysis, thus the Court need not apply it.

*Sec. Ex re. Chertoff,* 511 F.3d 216, 221 (1st Cir.2007); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

 If the plaintiff successfully establishes a *prima facie* case of discrimination, the defendant may then rebut the plaintiff's *prima facie* case by providing a legitimate, non-discriminatory reason for its action(s). *Tex. Dept. of Comty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Mariani–Colon,* 511 F.3d at 221. If the defendant provides a legitimate, non-discriminatory reason, then to defeat summary judgment the plaintiff must demonstrate that the reason was a pretext for unlawful discrimination. *Id.* This may be done by showing that a discriminatory reason more likely motivated the defendant, or by showing that the proffered reason lacks credibility. *Tex. Dept. of Comty. Affairs,* 450 U.S. at 256, 101 S.Ct. 1089.

 At the outset the defendants contend, without citing any authority, that Cuadros has failed to establish a *prima facie* case of discrimination with regard to these tangible employment actions claims.[12] (Docket No. 54 at 14) Cuadros is a Peruvian female and is thus a member of a protected class, satisfying the first prong necessary to establish a *prima facie* case. The Court assumes, and neither parties contests, that Cuadros is qualified for the positions she held at D'Nieto. Where defendants believe the plaintiff fails is at the third prong—adverse employment action: the defendants argue that the plaintiff suffered no tangible adverse action. The Court agrees.

"The term 'adverse employment action' arose in the Title VII context as a shorthand for the statutory requirement that a plaintiff show an alteration in the material terms or conditions of his employment." *Bergeron v. Cabral,* 560 F.3d 1, 7–8 (1st Cir.2009) (internal citations omitted). The First Circuit Court of Appeals includes "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees" as possible adverse employment actions. *Hernandez–Torres v. Intercontinental Trading, Inc.,* 158 F.3d 43, 47 (1st Cir. 1998) (internal citations omitted). Despite these guidelines, determining whether an action is "adverse" "necessarily requires a case-by-case inquiry." *Blackie v. Maine,* 75 F.3d 716, 725 (1st Cir.1996) (internal citation omitted).

As the Court understands it, Cuadros suggests three possible tangible employment actions taken against her as a result of discrimination: (1) loss of medical benefits during the gap between D'Nieto's coverage of Cuadros's COBRA plan and the procurement of D'Nieto's group coverage for all employees; (2) denial of vacation and medical benefits; and (3) loss of overtime pay due to reclassification as an "exempt" employee. The Court finds that plaintiff has failed to meet the adverse employment action prong needed support these three tangible employment action claims.

Cuadros's first claim is based on a gap of less than two months during her employment with D'Nieto during which she was provided no health coverage. Plaintiff fails to show, however, that any health

---

12. The defendants' argument on this point is bare of any citation to legal authority. It merely contends that the plaintiff has suffered no tangible job detriment or "altered working conditions"—language which may rhetorical-

ly reference statutory terminology yet which provides the Court with no guidance about the standards and corresponding case law governing the determination of what constitutes an adverse employment action.

benefits to which she was entitled were ever denied to her by D'Nieto, and thus that she suffered an adverse employment action as defined under Title VII. The record contains testimony indicating that Cuadros was in fact the only employee to receive medical coverage—in the form of a negotiated agreement entailing D'Nieto's coverage of Cuadros's COBRA plan connected to a prior employer—until D'Nieto procured a group coverage plan in July of 2007. Although Cuadros testified in her deposition that she believed D'Nieto should have anticipated her COBRA plan's expiration and procured health benefits for her, she introduces no evidence showing that D'Nieto had contracted to provide her coverage beyond the COBRA plan's expiration or that she was entitled to coverage during the gap between D'Nieto's coverage of her COBRA benefits and her coverage under D'Nieto's group plan.

Even were the Court to find that the two month gap in Cuadros's medical coverage constituted a denial of benefits equal to an "adverse action" under Title VII, nothing in the record supports the inference that D'Nieto discriminated against Cuadros. "There must be a causal link between the tangible employment action and the alleged harassment." *Lee–Crespo v. Schering–Plough del Caribe Inc.*, 354 F.3d 34, 44 (1st Cir.2003). Cuadros alleges that discrimination against her national origin can be inferred from comments made to her by her supervisor, De Leon. De Leon told Cuadros on occasion[13] that Cuadros should "feel well paid," which Cuadros interpreted to mean that Cuadros, because of her Peruvian origin, should not complain about her income. Cuadros also alleges that De Leon criticized Cuad-

ros's work performance by telling Cuadros, that might be the way you do things in "your country," but it is not the way things are done at the company. Regardless of whether Cuadros's impression that these comments regarded her Peruvian origin were, in fact, true, Cuadros does not allege that De Leon had the authority to provide Cuadros with health benefits. To show a causal link between the tangible employment action (which, in this case, is allegedly the denial of health benefits) and the alleged harassment (which, in this case, amounts to the above-mentioned comments made by one supervisor), "the harassing supervisor must be the one who orders the tangible employment actions or, at the very least, must be otherwise substantially responsible for the action." *Id.*

Even were the Court to view De Leon's comments as motivated by discriminatory animus, nowhere does the record show that De Leon denied medical benefits entitled to Cuadros. In fact, the record shows that De Leon herself was not entitled to medical benefits until D'Nieto's group plan was provided in July of 2007. Cuadros may even have enjoyed a favored status with regard to health benefits at the company, as the only employee receiving benefits at all prior to 2007. For these reasons, Cuadros's claim of discrimination based on denial of medical benefits is DISMISSED.

The Court outright rejects Cuadros's claim that she was denied her vacation time. Cuadros took nineteen days of vacation, from December 18, 2006 to January 16, 2007, four of which exceeded her accumulated vacation time (and which she thus took unpaid). Although Cuadros received an interoffice memorandum reprimanding

---

**13.** The record is unclear regarding the frequency of these alleged comments. The Court thus assumes in a light favorable to the plaintiff that there were repeated comments linked, as she recalled in her deposition, to times when the plaintiff complained about her income during periods of pay disbursement.

her for notifying the company about her vacation too close in proximity to her planned vacation, and although her supervisor, Wanda De Leon interrupted her vacation with phone calls and request to return early, Cuadros stayed in Peru for the full duration of her planned trip. Further, Cuadros testified in her deposition that when she spoke with Uniformes representative Michael Meyer, she wanted to take responsibility for the consequences provoked by her lengthy time away from work (perhaps regarding her work performance or the completion of timely tasks related to her position), to which Meyer responded that they all move on and move forward together. No adverse action other than discomfort is evident from the existing record. In no way was her vacation denied to her. "Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Blackie,* 75 F.3d at 725.

At most, what Cuadros is alleging is a difficult encounter with her supervisor about her vacation, which is among the most common complaints in workplaces today. A jury might find that Cuadros's supervisor, De Leon, handled the communications regarding her vacation poorly, or even that De Leon was petty, selfish or intentionally inconsiderate. "But Title VII is neither a civility code nor a general anti-harassment code." *Lee–Crespo,* 354 F.3d at 37. As in her claim regarding denial of medical benefits, Cuadros also sustains no causal link between the interactions surrounding her vacation and any discrimina-

tion based on her national origin. Again, despite the comments made by De Leon that Cuadros suspected were based on her Peruvian origin, De Leon did not deny Cuadros her vacation time, thus no adverse employment action was suffered. As such, the claim that Cuadros was denied her vacation benefit is DISMISSED.

Cuadros's third tangible employment action claim under Title VII regards her reclassification from Administrative Assistant, a position that allowed Cuadros to claim overtime payments, to Sales Assistant, an "exempt" position which does not permit overtime payments. "The clear trend of authority is to hold that a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Marrero,* 304 F.3d 7, 23 (1st Cir.2002)(internal quotations and citations omitted). Even a "materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank and Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993). "Otherwise every trivial personnel action that an irritable … employee did not like would form the basis of a discrimination suit." *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996).

Cuadros claims to have suffered an adverse employment action because, as an exempt employee, she would no longer receive overtime payment. Her claim is an odd one, as a reassignment from non-exempt to exempt status would typically be viewed as a positive, rather than adverse, employment action.[14] Nevertheless, Cuad-

14. Although not defined anywhere on the record, either by the defendant employers or the plaintiff employee, the Court understands that exempt employees are employees who, because of their managerial, supervisory, administrative or leadership duties and responsibilities and level of decision making authority, are exempt from the overtime provisions of the Fair Labor Standards Act. Exempt employees are generally expected, by

ros testified during her deposition that she was upset that after her reclassification in January, 2007, to exempt status, she was asked to work on some Saturdays and after work without compensation. The record does indicate that the D'Nieto was implementing changes that served to cut back on expenditures through the discipline of employees. While the meaning and effect of the changes is unclear, Cuadros may certainly have understood her exempt status as a negative change. "Proof of more than [plaintiff's] subjective belief that [s]he was the target of discrimination, however, ... is required" to show discrimination. *Mariani–Colón,* 511 F.3d at 222 (internal citation and quotation omitted).

Typically, the case law regarding adverse employment actions deal with employers who either: "(1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for promotion after a particular period of service." *Blackie,* 75 F.3d at 725. In this case, the plaintiff must show that she suffered in one of these recognized ways. The evidence, even when viewed in the light most favorable to Cuadros, "is insufficient to prove that, viewed objectively, this transfer was an adverse personnel action." *Marrero,* 304 F.3d at 25 (internal quotation and citation omitted). The fact that Cuadros could have felt upset, punished, retaliated against, stigmatized, saddened, angry, indignant, or any other sort of emotion because of De Leon's poor management or rude style of communication is not enough. "A more tangible change in duties or working conditions is needed" before Cuadros's experience at D'Nieto of being reclassified would amount to a demotion. *Id.* (internal quotations and citations omitted); *see Flaherty v. Gas Research Institute,* 31 F.3d 451, 456 (7th Cir.1994) (a "bruised ego" is not enough); *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 887 (6th Cir.1996) (demotion without change in pay, benefits, duties, or prestige insufficient); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir. 1994) (reassignment to more inconvenient job insufficient).

In *Marrero v. Goya of P.R.* the First Circuit Court of Appeals held that an employee's transfer was not an adverse employment action because it was not sufficiently disadvantageous. The employee-plaintiff returned to work to find she had been transferred to another department. Though she filled the same position in name, she was required to do more work, was subjected to extreme supervision, and forced to be scrutinized during a period of probation. Despite these changes, that many employees might find objectionable, the Court held that "the sort of intensified personal animus, hostility, disrespect, and ostracism that Marrero alleged here fails to constitute a material employment disadvantage sufficient to transform an ostensibly lateral transfer into an adverse employment action." *Id.* (internal citations and quotations omitted).

Although the burden on plaintiffs to make out a *prima facie* case of discrimination is "not onerous, as only a small showing is required," Cuadros has failed to make that small showing. *Mariani–Colon,* 511 F.3d at 221–22 (1st Cir.2007) (in-

---

most organizations, to work whatever hours are necessary to accomplish the goals of their function. Accordingly, exempt employees tend to have more flexibility in their schedules to come and go as necessary to accomplish work than do non-exempt or hourly employees.

ternal citation and quotations omitted). Cuadros has not introduced sufficient factual evidence to assure the Court that any adverse employment action took place against her. Cuadros only points out that she was no longer qualified as an exempt employee for overtime payments. She presents nothing in the record, however, to show that her reclassification amounted to a loss in benefits, salary, or other significant change that might demonstrate that D'Nieto meant to *demote* her. Although the record contains a memorandum to Cuadros detailing the tasks required of her following her reclassification, the Court has no prior list of tasks on which to base any comparison between Cuadros's non-exempt and exempt positions. The dearth of information regarding the material or status-based impact of the reclassification on Cuadros's experience in her workplace requires the Court to conclude that the plaintiff failed to established that she suffered any adverse employment action, and therefore that she failed to make out a *prima facie* case under Title VII.

■ Even assuming, *arguendo,* that Cuadros did establish a prima facie case of discrimination,[15] the record does not support a reasonable juror in finding that the reclassification occurred as a result of a discrimination based on Cuadros's national origin. In the burden-shifting analysis, Cuadros must be able to persuade the factfinder that she experienced unlawful discrimination at the hands of her employer and present sufficient evidence to show both that the employer's articulated reasons for the adverse employment action was a pretext and the true reason was discrimination. Plaintiff utterly fails to succeed in raising competent evidence to show that the defendants' reason for her reclassification was merely a pretext. .

Because Cuadros's opposition to summary judgment was stricken from the record as untimely, no argument is made by Cuadros on the record as to why the defendants' articulated reasons for Cuadros's reclassification might be a pretext. Nevertheless, the Court draws all inferences which may be made from the evidence on the record in Cuadros's favor, and still finds that her contention of discrimination does not bear out.

The only support whatsoever for *all* of Cuadros's claims pursuant to Title VII national origin discrimination are the comments allegedly made by De Leon to Cuadros: (1) that Cuadros should feel well paid; (2) that Cuadros may not know the laws of Puerto Rico because she is not from Puerto Rico; and (3) that a task may be done a certain way "in your country"—"but not here." Cuadros raises these comments as support for her claim that her reclassification occurred as a result of discrimination, and indeed the comments may have may have seriously nettled her, yet she fails to show how the comments are linked in any way to her reclassification.

The defendants claim that Cuadros's reclassification was due to D'Nieto's legitimate need to implement a series of "controls" in the workplace, including the reorganization of various staff responsibilities, due to the financial difficulties experienced in early 2007 by the D'Nieto and Uniformes. Cuadros herself admitted in testimony and also indicated in letters written to Meyer that she knew that the company was in financial difficulties. Nowhere in those letters or in the emails she wrote to Meyer or De Leon did Cuadros indicate that her reclassification

---

**15.** Although no party raised it, the Court also finds that the plaintiff failed to establish the fourth and final prong required for a Title VII discrimination case: nowhere does the record indicate that Cuadros's prior, non-exempt position was filled by anyone else.

was the result of discrimination based on her national origin. When asked repeatedly in depositions why she believed De Leon was treating her badly, she consistently answered that she did not know.

Generally, stray remarks made in the workplace do not alone constitute probative evidence that the preferred explanation for an employment decision was pretextual. "Mere generalized 'stray remarks,' arguably probative of bias against a protected class, normally are not probative of pretext absent some discernible evidentiary basis for assessing their temporal and contextual relevance." *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 36 (1st Cir.2001) (internal citation omitted). Cuadros worked with De Leon without incident for two years, from late 2004 through late 2006. Cuadros does not indicate that the comments she alleges were made by De Leon referring to Cuadros's national origin began suddenly in 2006, or that the comments were ever related directly to the reclassification (or any of the challenged workplace situations). *See id.* ("In combination with other evidence, so-called 'stray remarks' may permit a jury reasonably to determine that an employer was motivated by a discriminatory intent ... But though such 'stray remarks' may be material to the pretext inquiry, their probativeness is circumscribed if they were made in a situation temporally remote from the date of the employment decision, or ... were not related to the employment decision in question, or were made by nondecisionmakers") (internal citations and quotations omitted).

In short, Cuadros has done nothing to show that her reclassification can be attributed to discrimination based on her national origin. The Court's review of the record makes clear that only the plaintiff's "subjective speculation and suspicion"

drive her complaint regarding her reclassification. That is not enough. For these reasons, Cuadros's claim based on her reclassification is DISMISSED.

### ii. Hostile Work Environment

A hostile work environment exists in violation of Title VII "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations and quotations omitted). In this case, Cuadros claims she was subjected to a hostile work environment.

To prove a hostile work environment, Cuadros must show that she was subjected to severe or pervasive harassment that materially altered the conditions of her employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (*citing Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (additional citation omitted)). The harassment must be both objectively and subjectively offensive such that a reasonable person would find it hostile or abusive, and the victim must also perceive the conduct in question to be hostile or abusive. *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275 (*citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

There is no "mathematically precise test" for determining if conduct reaches the threshold of being so severe or pervasive that it creates a work environment abusive to employees. *Harris*, 510 U.S. at 22–23, 114 S.Ct. 367. To determine if a reasonable person would find a

work environment hostile or abusive, a court must consider the totality of the circumstances. *Id.* at 23, 114 S.Ct. 367. "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* "The thrust of this inquiry is to distinguish between the ordinary, if occasionally unpleasant, vicissitudes of the workplace and actual harassment." *Noviello,* 398 F.3d at 92 (citation omitted). For example, " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (citing *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

▆▆ The Court need go further than reciting the standard required to establish why Cuadros's claim fails. Cuadros alleges no more than what may be considered offhand comments and isolated incidents of a nature too mild to withstand summary judgment. The record establishes that the behavior of which Cuadros complains did not always exist; that, in fact, De Leon and Cuadros previously operated in their workplace without incident. The Court agrees with Michael Meyer's assessment of the ongoing conflict between De Leon and Cuadros—that this was a friendly relationship, if not an actual friendship, gone bad. Cuadros and De Leon spent time together socially outside of work, both during holidays and on the beach. Although the Court will not attempt to read into the significance of their social interactions (after all, many times colleagues socialize in out-of-work settings out of an unspoken obligation to promote workplace unity), it is clear that the problems between Cuad-

ros and De Leon developed after more than two years of working together without any formally registered complaints. It is equally clear from the record that Cuadros was unsure why she was being treated poorly by De Leon, and that both of them participated in filing complaints against each other for a period of many months during 2007. The record shows that their conflict was mutual, and extremely unpleasant, but it does not support the inference that the conflict was generated by any discriminatory animus.

De Leon's general lack of civility and disregard for professionalism may have created an unpleasant working environment for Cuadros, and De Leon's comments may have been made in poor taste, "but a supervisor's unprofessional managerial approach and accompanying efforts to assert her authority are not the focus of the discrimination laws." *Lee–Crespo,* 354 F.3d at 46–47. The behavior complained of here simply does not rise to the level contemplated by Title VII protections. For these reasons, Cuadros's hostile working environment claim is DISMISSED.

## A. Supplemental Commonwealth Law Claims

▆▆ Because no federal claims remain to ground jurisdiction in this case, Cuadros's Commonwealth law claims against the defendants are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II. Conclusion

For the reasons provided above, the Court **GRANTS** the defendants' motion to strike the plaintiff's opposition to summary judgment; and the Court **GRANTS** the defendants' motion for summary judgment. Therefore, the Court **DISMISSES** with **PREJUDICE** Cuadros's claims of discrimination raised pursuant to Title VII, and **DISMISSES** without **PREJUDICE** Cuad-

ros's Commonwealth law claims. Judgment shall enter accordingly.

**IT IS SO ORDERED.**